[Civil No. 1848. Filed May 27, 1921.]

[198 Pac. 122.]

# HENRY COHEN, Appellant, v. FIRST NATIONAL BANK OF NOGALES, a Corporation, Appellee.

1. BANKS AND BANKING—NOTICE AND DEPOSIT SLIP HELD TO SHOW INTENT TO GIVE DEPOSITOR CREDIT FOR AMOUNT OF CHECK. — A printed notice, sent by mail by bank which received check drawn on it by mail from depositor: "We beg to acknowledge receipt of your favor of 8–6. We have entered to your credit $3,567.50. All other items than those drawn on this bank are credited subject to final payment"—and the making of a deposit slip, a copy of which was inclosed with the notice, showed an intention to give the depositor absolute credit for the amount of the check.

2. BANKS AND BANKING—MAILING OF NOTICE OF CREDIT AND DEPOSIT SLIP COMPLETED DEPOSIT.—When drawee bank mailed notice of credit of amount of check drawn on it, together with copy of deposit slip, the transaction was closed, and it became a completed contract, whether or not the letter containing the notice and deposit slip actually reached the depositor, and the bank could not subsequently retrace its steps, notwithstanding that it had not stamped the check "Paid" or debited the drawer's account with the amount thereof; such matters not concerning the depositor.

3. BANKS AND BANKING—GIVING CREDIT FOR CHECK SAME AS RECEIVING DEPOSIT OF MONEY.—Where a check drawn on a particular bank is presented to that bank for general deposit, and the bank gives the depositor credit therefor, the relation between the bank

and the depositor is that of debtor and creditor, the giving of the credit being practically and legally the same as if the bank had paid the money to the depositor, and had received it again on deposit.

4. BANKS AND BANKING—NO WRITTEN ACCEPTANCE OF CHECK NECESSARY TO HOLD DRAWEE BANK CREDITING IT TO DEPOSITOR.—Where depositor presented check to drawee bank and the amount thereof was credited to him, the transaction was not an acceptance of the check that must be in writing under Civil Code of 1913, section 4277, such transaction being payment of the check, and not mere acceptance.

5. APPEAL AND ERROR—WANT OF AUTHORITY OF AGENT CANNOT BE RAISED FIRST ON APPEAL.—Want of authority on the part of an employee to extend credit of bank cannot be raised for the first time on appeal by the bank from a judgment holding it liable for the amount of a deposit, represented by a check drawn on the bank by one having insufficient funds.

6. BANKS AND BANKING — EMPLOYEE HELD TO HAVE AUTHORITY TO EXTEND CREDIT.—An employee of a bank whose duty was to answer correspondence and prepare mailing matter, and to send out printed notices of credits given for checks received by mail, had authority to extend credit for a check drawn on the bank, and sent to it by mail for deposit; the notice being a printed form and the name of the cashier of the bank being printed thereon.

7. ESTOPPEL—DEPOSITOR NOT ESTOPPED BY TELEGRAM AND RETENTION OF CHECK RETURNED ON CLAIMING CREDIT THEREFOR.—Where bank credited depositor with check drawn on it, but, on discovery of insufficient funds to cover the check, returned the same to the depositor, *held* that retention of the check by the depositor and telegrams to the bank to hold drawer's funds, etc., did not operate as an estoppel to claim the credit given, as the bank could have recovered on the check as against the drawer, although it remained in the depositor's possession.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. W. A. O'Connor, Judge. Reversed, with directions.

STATEMENT OF FACTS.

An unusually full statement of facts is essential to an understanding of this case. They are substantially as follows: On August 6, 1919, Henry Cohen sent by mail, from his place of residence, Culiacan, Mexico, to the First National Bank of Nogales, situated at

Nogales, Arizona, a check on said bank for $3,567.50, payable to his order and drawn by Octavo Gaxiola. The check was indorsed by Cohen, "Pay to the order of First National Bank of Nogales." In the letter inclosing the check Cohen requested that the same be placed to his credit, and that he be advised by return mail. At the time both Cohen and Gaxiola were depositors in the bank. The letter and check were received by the bank on Saturday, August 9, 1919. Upon receipt of the bank's mail it was opened by Mr. Grover Marsteller, assistant cashier of the bank, and by him passed to Miss Barney, who at the time was acting in the absence of the regular mail clerk, and whose duty it was to acknowledge receipt of letters, make out deposit slips of inclosed items, etc., and pass the items to the tellers and bookkeepers of the bank. Miss Barney addressed a letter to Cohen, in which she inclosed a printed form of acknowledgment. The form was prepared by the bank, and used by the bank in acknowledging the receipt of remittances from its customers. The form was as follows, the blanks therein being filled in by Miss Barney:

"Nogales, Arizona, 8–9, 1919.

"Henry Cohen,

"Culiacan, Sin.—

"Dear Sir: We beg to acknowledge receipt of your favor of 8–6. We have entered to your credit $3,-567.50.

"All other items than those drawn on this Bank are credited subject to final payment.

"Very truly yours,
"THERON RICHARDSON,
"Cashier.

"By EMB."

The name "Theron Richardson, Cashier," was printed, being part of the printed form. The letters "E. M. B." were written or typed by Miss Barney.

Miss Barney also, at the same time, made out a deposit slip in form as follows:

"Deposited in the First National Bank, Nogales, Arizona, by Henry Cohen.

(Please list each check separately.)

Currency ..............................

Gold ..................................

Silver ................................

     (Mail Aug. 9, 1919)

Checks ................................

  L 8–6................................... $3,567.50

  (American money.)"

A copy of this deposit slip was also sent to Cohen by Miss Barney in the same letter in which the printed form was inclosed. Miss Barney took the check and the deposit slip so made out by her to a teller. This teller made a notation of the check on his sheet, then placed the check on one spindle and the deposit slip on another. Later on the same day a bookkeeper came to the teller's cage and got all the checks and deposit slips on the spindles, which by that time the teller had assorted alphabetically. The checks and deposit slips were divided amongst the bookkeepers. There were three bookkeepers: No. 1, who handled all accounts from A to F; No. 2, who handled accounts from G to O; and so on. The deposit slip to Cohen went to bookkeeper No. 1, and the check of Gaxiola went to bookkeeper No. 2. Bookkeeper No. 1, when he came to the letter C, posted, under the name of Cohen, the amount which the deposit slip showed as a deposit made by Cohen on that day; that is to say he credited the account of Cohen with the amount of the deposit slip, $3,567.50. Bookkeeper No. 2, who actually received the Gaxiola check when he reached Gaxiola's account, saw there was not sufficient funds to Gaxiola's credit to pay the check, so he did not post up the check in the account

of Gaxiola, but marked the check "Ins," meaning insufficient funds, and placed it aside in "suspense" for instructions; he having no authority to allow overdrafts. This was all done on Saturday, August 9th, the day the check was received. Monday, August 11th, on the opening of the bank, the clerk in charge of the Gaxiola check called the attention of the vice-president to the check and the state of Gaxiola's account. The vice-president directed that the check should not be paid, and that a telegram be sent to Cohen, advising him the check was not good. The item of the check was thereupon charged back to the account of Cohen. On the same day a telegram was sent by the bank to Cohen, advising him that the check was not paid for lack of funds. A letter was also mailed to Cohen, with the check inclosed. The letter also advised that the check was not paid for want of funds. Cohen received the telegram on August 12th, and on the same day wired the bank as follows:

"If you. returned Gaxiola check, hold money to cover it. If not paid in three days, wire me and I will leave for there."

To this telegram the bank, on August 13th, wired in reply:

"Your wire. No funds deposited to cover Gaxiola check which we returned."

After these telegrams had reached Cohen he received, by mail, the letter of acknowledgment dated August 9th, which Miss Barney had sent, inclosing the printed form and deposit slip. On August 14th, Cohen wired the bank as follows:

"I cashed Gaxiola check with metallic gold so he could pay export on garbanzos. If you think it won't be paid, wire me so I can get there and attach same."

To this the bank replied by wire:

"Yours yesterday. We recommend you take steps to protect your interest."

On August 19th, Cohen went to the bank and asked for a statement of his account. This was given to him. The statement shows, under the head of "Deposits" the following: "August 9, $3,567.50"—and under the head of "Checks in Detail" the following: "Aug. 11, $3,567.50," being the credit and debit of the Gaxiola check, copied from the ledger of the bank. On August 22, 1919, Cohen drew a check on the bank, in favor of himself, for $3,567.50, and presented same for payment. The bank refused to pay it on account of insufficient funds. Cohen then instituted this suit against the bank. The account of Octavo Gaxiola as it appeared in the ledger of the bank showed that the balance to the credit of Gaxiola on August 9, 1919, when the bank received the check, and thereafter, did not exceed $49.66. The check was never stamped "Paid" by the bank.

Messrs. Duffy & Purdum and Messrs. Flanigan & Murry, for Appellant.

Mr. Frank J. Barry, Mr. W. L. Kinder, and Mr. Selim M. Franklin, for Appellee.

BAKER, J. (After Stating the Facts as Above.)— This is an appeal from a judgment of the superior court of Santa Cruz county, in favor of the bank. The action is to recover the sum of $3,567.50, claimed to have been on deposit with the bank, to the credit of the plaintiff.

While the facts in the case, as will be observed from the foregoing statement, are a little unusual, we see no difficulty in the application of one or two very plain principles of law which have been long established.

The natural and obvious meaning of the language used in the notice which the bank sent to the plaintiff, through the mail, is that credit had been given to the plaintiff to the extent of the amount of the check. No ingenuity of interpretation, or stretching of the meaning of the words, can bring the language into harmony with any other hypothesis. That the bank intended to give the plaintiff credit for the amount of the check is plainly evinced, not only by the notice and deposit slip, but is further demonstrated by the fact that on the same day that the letter was sent the bank entered a credit upon its books, in favor of the plaintiff, for the amount of the check. As a matter of law, when the bank mailed the notice and deposit slip, the transaction was closed. In the eye of the law it became a completed transaction. Thus it is stated in 13 C. J. 300:

"Where a person makes an offer and requires or authorizes the offeree, either expressly or impliedly, to send his answer by post or telegraph, and the answer is duly posted or telegraphed, the acceptance is communicated, and the contract is complete from the moment the letter is mailed or the telegram sent."

See, also, 6 R. C. L. 610–613.

The result of the foregoing rule is that it is immaterial whether the letter of acceptance actually reaches the offerer (6 R. C. L. 612), and it may be added that it is also immaterial whether the letter is delayed in the mails two or three days. 13 C. J. 301.

However, as we understand the argument of counsel for the bank, a distinction is sought to be drawn where a check is sent through the mail to a bank to be deposited, and where the holder of the check appears in person in the bank and offers to deposit it. But in principle there can be no such distinction. There can be no question that a contract can be made

between persons who are at a distance from each other by and through the mail. By treating the post-office as the agency of both parties, courts manage to harmonize the legal notion that it is necessary that the minds of the parties should meet. 6 R. C. L. 612.

But nevertheless the bank contends that the transaction in this case was not completed. It is argued that the steps taken by the bank were only tentative and preliminary, and that final credit for the check was never given to the plaintiff. As already pointed out, the bank plainly evinced the intention to pay the check by mailing the letter with the inclosures. It is true that a mere intention to pay is not equivalent to payment, but we are here confronted with a situation where the bank executed its intention. It is also true that the proper records were to be made upon the books, but payment of the check or giving credit therefor (which is equivalent to payment) was effected at the time the letter was posted, and was valid even without any record. So far as respected the plaintiff, it was not essential to the completion of the contract that the bank should have stamped the check "Paid" or debited the Gaxiola account with the amount of the check. These steps did not concern the plaintiff; they were matters pertaining to the system of bookkeeping conducted by the bank for its own convenience and to expedite its own business.

The bank was not obliged to take the check or send the letter, but if it chose to do both it must stand by the contract thereby made. Under the completed transaction the relation between the parties was that of banker and depositor, and the bank became the debtor to the plaintiff for the amount of the general deposit placed to his credit. And its liability could be discharged only by payment of the debt. After the discovery that the funds in the

Gaxiola account were insufficient to take care of the check, the bank attempted to retrace its steps. This it could not do. It was too late. The transaction was already completed. The discovery could not operate to change the nature of the contract or discharge the bank from liability. Consequently marking the check with the letters "Ins," indicating the insufficiency of funds in the Gaxiola account, and charging back the amount of the check to the plaintiff's account, were immaterial acts, and of no effect. And the subsequent action of the bank in telegraphing the plaintiff that the check was worthless and returning it to him were also ineffective and powerless to discharge the liability of the bank. It may be, if the condition of the Gaxiola account had been examined before the letter was mailed, credit would not have been given, but the bank did not see fit to make the examination. It waived all inquiry and sent the letter. Manifestly the present dilemma of the bank is due wholly to its own laches.

The law is firmly settled that where a check, drawn on a particular bank, is presented to that bank for general deposit, and the bank gives the depositor credit therefor, the relation between the bank and the depositor is that of debtor and creditor, since the giving of credit under such circumstances is practically and legally the same as if the bank had paid the money to the depositor and had received it again on deposit. The transaction is thus complete, and cannot be rescinded except for fraud or in case of mutual mistake. Tiffany on Banks and Banking, pp. 38, 39; 2 Morse on Banks and Banking, par. 569.

"When a bank credits a depositor with the amount of a check drawn upon it by another customer, and there is no want of good faith on the part of the depositor, the act of crediting is equivalent to a payment in money, and the bank cannot recall or repudiate the payment because, upon an examination of the

accounts of the drawer, it is ascertained that he was without funds to meet the check, though, when the payment was made, the officers labored under the mistake that there were funds sufficient. In such a case the bank could have received the check conditionally, and have come under obligations to account to the holder for it, only in the event that on an examination of the accounts of the' drawer it was found he had funds to meet it, or in the event that he provided funds for its payment. Or it could have asked for time to examine the accounts, that it might determine whether it would accept and pay or dishonor the check. It would have been within the option of the holder to have accepted or rejected either of .these propositions. But when the holder presented the check with his passbook, that the check might be entered as a deposit to his credit, it was a request for the payment of the check; and there can be no distinction between a request for payment in moneys and a request for payment by a transfer to the credit of the holder." 3 R. C. L. 526.

The court says in *Bank* v. *Burkhardt,* 100 U. S. 689, 25 L. Ed. 766:

"In Morse's well-considered work on Banking, page, 321, it is said: 'But if at the time the holder hands in the check he demands to have it placed to his credit, and is informed that it shall be done, or if he holds any other species of conversation which practically amounts to demanding and receiving a promise of a.transfer of credit, as equivalent to an actual payment, the effect will be the same as if he had received his money in cash, and the bank's indebtedness to him for the amount will be equally fixed and irrevocable.' We regard this as a sound and accurate exposition of the law upon the subject, and it rests upon a solid basis of reason."

In the more recent case of *American National Bank of Nashville* v. *Miller, Agent,* 229 U. S. 517, 57 L. Ed. 1310, 33 Sup. St. Rep. 883, the Supreme Court 'of the United States, speaking through Mr. Justice LAMAR, says:

"There are some disadvantages of sending a check for collection directly to the bank on which it is drawn, but when such bank performs the dual function of collecting and crediting, the transaction is closed, and, in the absence of fraud or mutual mistake, is equivalent to payment in usual course. . . . In the present case it was as though an officer of the Macon Bank had presented the check to the teller of the Nashville Bank, and on receiving the money had paid it back over the counter for deposit to the credit of the Macon Bank."

In *Oddie* v. *National City Bank of New York*, 45 N. Y. 735 (6 Am. Rep. 160), Chief Justice CHURCH, in stating the opinion of the court, says:

"Financial business is transacted at banks in large amounts, with great rapidity, but according to definite and certain rules, which are well understood and acted upon by those engaged in that business. Very little is said, but very much is understood, and there is an absence of all formalities which tend to embarrass the facility of doing the business.

"In determining the legal effect of such transactions, we must apply the same rules applicable to all contracts and business affairs, and effectuate and carry out the intention of the parties, to be gathered from their acts and declarations, and the accustomed and understood course of the particular business. Applying these rules, there can be no doubt but there was an express demand on one side, and consent on the other, that this check should be placed to the credit of the plaintiffs as a deposit. The legal effect of the transaction was precisely the same as though the money had been first paid to the plaintiffs, and then deposited. When a check is presented to a bank for deposit, drawn directly upon itself, it is the same as though payment in any other form was demanded. It is the right of the bank to reject it, or to refuse to pay it, or to receive it conditionally, as in *Pratt* v. *Foote*, 9 N. Y. 463; but if it accepts such a check and pays it, either by delivering the currency, or giving the party credit for it, the transaction is closed be-

tween the bank and such party, provided the paper is genuine.

"In the case of a deposit, the bank becomes at once the debtor of the depositor, and the title of. the deposit passes to the bank. The bank always has the means of knowing the state of the account of the drawer, and if it elects to pay the paper, it voluntarily takes upon itself the risk of securing it out of the drawer's account or otherwise. If there has ever been any doubt upon this point, there should be none hereafter."

The Chief Justice further said, in the course of the opinion:

"Here the plaintiffs clearly put in the check as a deposit, and the defendants as clearly received it as such, and credited the plaintiffs with it. The credit on the deposit ticket was as significant an act, evincing the consent of the defendants to the payment of it, as if made upon the passbook of the plaintiffs, and entered upon the books of the bank."

To the same effect are *Burton* v. *United States,* 196 U. S. 283, 49 L. Ed. 482, 25 Sup. Ct. Rep. 243; *Security National Bank of Sioux City, Iowa,* v. *Old National Bank of Battle Creek, Mich.,* 241 Fed. 1, 154 C. C. A. 1; *Wasson* v. *Lamb,* 120 Ind. 514, 16 Am. St. Rep. 342, 6 L. R. A. 191, 22 N. E. 729; *Woodward* v. *Savings & Trust Co.,* 178 N. C. 184, 5 A. L. R. 1561, 100 S. E. 304; *City National Bank of Selma* v. *Burns,* 68 Ala. 267, 44 Am. Rep. 138; *American Exchange National Bank* v. *Gregg,* 138 Ill. 596, 32 Am. St. Rep. 171, and note, 28 N. E. 839; *Nineteenth Ward Bank* v. *First National Bank,* 184 Mass. 49, 67 N. E. 670.

We are cited to the cases, *National Gold Bank & T. Co.* v. *McDonald,* 51 Cal. 66, 21 Am. Rep. 697, and *Ocean Park Bank* v. *Rogers,* 6 Cal. App. 678, 92 Pac. 879, as supporting the contention of the bank that no credit was actually given. *National Gold Bank* v. *McDonald* was a case in which a depositor presented a check drawn in his favor upon the plaintiff's bank.

He was credited in his bank-book for the amount of the check, but when the day's business was reviewed it was discovered that the drawer had no funds on deposit. Accordingly the bank charged the depositor's account with the amount of the check. It was held that the transaction of itself did not import an agreement by the bank to accept the check as cash. The substance of that decision is that a bank has until the close of business hours for the day to determine whether or not final credit will be given for a check drawn upon and payable by itself. The facts of that case and *Ocean Park Bank* v. *Rogers* are almost identical. Neither case goes so far as to hold that no agreement is possible whereby the bank in which a check is deposited may receive it as cash. Laying aside the thought that these cases appear to be out of line with the general current of authorities, we do not think that they are applicable to the facts of the present case. In these cases the act of charging back the checks to the account of the depositors was done on the same day that the credit was given. Here the amount of the check was charged back to the account of the plaintiff on the second day (including Sunday) after it was received and the letter to the plaintiff was mailed. If under the California cases the bank had the right to charge back the item of the check to the plaintiff's account at the end of the day's business upon which the check was received, surely that right cannot be said to go on *ad infinitum.*

The bank seems to rely upon the proposition that the transaction was only an acceptance of the check, and that under the negotiable instruments law of this state (section 4277, Civ. Code) such an acceptance must have been in writing and signed by some officer of the bank in order to be valid. But we think the bank loses sight of the fact that payment and acceptance are essentially different.

"Payment is a natural, expected and intended end of a check. Acceptance strengthens the vitality of a check and serves to prolong rather than to terminate the life of it. . . . Payment ends the life of a check. Acceptance reinvigorates it." *Hunt* v. *Security State Bank,* 91 Or. 362, 179 Pac. 248.

See, also, *Guthrie National Bank* v. *Gill,* 6 Okl. 560–565, 54 Pac. 434–436.

Here there was actual payment. We know of no rule of law that requires that such payment must be evidenced by a written instrument signed by some officer of the bank.

The bank argues that it is not liable in this case for the amount of the check, because Miss Barney, the young girl who mailed the letter and inclosures, had no authority to extend the credit of the bank. The argument is unsound for two very good reasons. In the first place, want of authority on the part of Miss Barney was not pleaded. The question has been raised for the first time since the case reached this court. In the second place, it is not questioned but that Miss Barney was an employee of the bank. Her duties were to answer correspondence and prepare mailing matter. The letter of advice sent to the plaintiff in its printed form was supplied by the bank to its employees for the very purpose for which this one was used. It is not questioned but that Miss Barney was authorized to prepare the letter and send it. It would be monstrous to hold that because the name of the cashier of the bank was printed the bank was not liable. The paper was the paper of the bank; its form was prepared by the bank, and used by the bank in notifying its customers of the receipt of remittances. The paper speaks for itself; therefore it was the bank extending credit, and not Miss Barney.

We are unable to perceive why the telegrams sent by the plaintiff to the bank or the retention of the check by him operated as an estoppel, as claimed by the bank. The elements of an estoppel have been concisely stated to be as follows:

"To constitute it, the person sought to be estopped must do such act or make such admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or admission is inconsistent with the claim he proposes now to make. The other party, too, must have acted upon the strength of such admission or conduct." *New York Rubber Co.* v. *Rothery,* 107 N. Y. 310, 1 Am. St. Rep. 822, 14 N. E. 269.

The bank returned the check to the plaintiff. It voluntarily parted with its possession. It would seem that it was the duty of the bank to request the return of the check if it considered it to be of any value. There is, however, no pretense whatever that the bank suffered any loss or changed its attitude to its disadvantage in any way by reason of the telegrams or the retention of the check. The bank could have recovered on the check as against Gaxiola, although the check had remained in plaintiff's possession. The doctrine of estoppel can have no application to this case.

We have reached the conclusions stated in this decision with a great deal of reluctance. It seems to be one of those cases where a party has the right to stand upon his legal rights no matter how selfish and harsh such conduct may appear to be. While we may not condemn the conduct of the plaintiff, we are not compelled to approve it. The case is decided as it is because we think it would be an extremely pernicious thing to throw doubt upon the scope of the doctrine governing negotiable paper. These doctrines are of immense value to every form of industry. To seek too readily for exceptions from the

well-settled rule of this branch of law in pursuit of a supposed equity would tend to impair the value of the principles of commercial law which depend largely upon their certainty. As much as this was said by Judge COOLEY in the case of *First National Bank* v. *Burkham,* 32 Mich. 328, which case is often cited in opinions dealing with the subject.

The judgment is reversed, with directions to enter a judgment for the plaintiff, Cohen, for the amount of the check, $3,567.50 and costs.

ROSS, C. J., and McALISTER, J., concur.